## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**VICKIE S. MOYER**                                                  **PLAINTIFF**

**v.**                          **CASE NO. 4:08-CV-00087 BSM**

**DVA RENAL HEALTHCARE, INC.**                                **DEFENDANT**

## ORDER

    Before the court is defendant DVA Renal Healthcare, Inc.'s ("DVA") motion for summary judgment. Plaintiff Vickie Moyer ("Moyer") has responded. For the reasons set forth below, the motion is granted.

## I.  FACTS[1]

    DVA, originally identified as Davita Healthcare, provides dialysis services for patients diagnosed with chronic kidney failure, a condition known as Chronic Kidney Disease ("CKD") or End Stage Renal Disease ("ESRD"). Statement of Facts (Doc. Nos. 14 and 23) ("Stmt. of Facts"), ¶ 1. During dialysis, patients are connected to a machine that mimics the functions of a healthy kidney by removing blood from the patient's body, filtering it, and returning it to the patient. *Id.* at ¶ 2. Patients suffering from CKD or ESRD are in a weakened physical state and are more susceptible to contracting infection; therefore, professional conduct and appropriate infection control are critical. *Id.* at ¶ 3. DVA policies

---

    [1] In its reply, DVA contends that plaintiff failed to comply with Local Rule 56.1. The court notes, however, that plaintiff filed her response to DVA's statement of undisputed material facts. *See* Doc. No. 23.

require all DVA dialysis employees to follow infection control practices, including washing their hands regularly and wearing Personal Protective Equipment ("PPE").  *Id*. at ¶ 4.

Moyer, a Caucasian female, worked for DVA as a Patient Care Technician ("PCT") in its Central Little Rock, Arkansas Dialysis Clinic (the "Clinic").  *Id*. at ¶ 5.  Moyer understood the importance of professional conduct and infection control, DVA's policies on these issues, and that failure to comply with those policies and procedures could result in disciplinary action up to and including termination.  *Id*. at ¶ 7.

In late 2006, the Clinic underwent significant operational changes, including hiring a new Facility Administrator (Monica Brooks), a new Clinical Nurse Manager (Karen Brown), and a budget overhaul which reduced available teammate work hours.  *Id*. at ¶ 8. To make up for fewer available work hours, Brooks and Brown, both of whom are African-American, permitted Moyer to work in another job position–in addition to her responsibilities as a PCT–so that she could work more hours and earn more money.  *Id*.  Additionally, Brooks and Brown attempted to accommodate Moyer's second job and arranged for other teammates[2] to contact Moyer directly if they needed coverage for their shift.  *Id*.

Moyer testified in her deposition that on March 6, 2007, she had a meeting with Brooks and Brown regarding her time management skills.  Moyer Dep. pp. 61-62, Defendant's Motion for Summary Judgment (Doc. No. 13) ("Def.'s Motion").  Moyer states that during the meeting they had a disagreement as to whether certain patient activities

---

[2]  DVA employees are referred to as "teammates."

needed to be documented, and Moyer got "mad and upset" and walked out of the office screaming that Brooks was wrong. *Id*. at 63-65. Moyer testified that Brooks followed her into the break room, where Moyer had picked up the phone to call compliance. *Id*. at 66. Moyer states that Brooks said, "If you call them, you will not have a job," so Moyer put the phone down. *Id*. Moyer further testified that Brooks "got right up in [her] face, and she said, I'm not going to – I wasn't going to write you up, but I'm going to have to now." *Id*. at 67. At some point during the confrontation, Moyer called Brooks a racist. *Id*. at 69. Moyer admits that the screaming and storming out of the meeting was inappropriate and contrary to DVA's policies and procedures, and that she did not have any quarrel if she was written up for her behavior. *Id*. at 67. Moyer received a verbal warning, which did not result in loss of pay, suspension, or demotion. *Id*. at 70-71; Stmt. of Facts, ¶ 11.

Moyer testified that she called the compliance hotline the following day to complain that she had been unfairly reprimanded, but did not tell anyone she was calling. Moyer Dep. p. 109, Def.'s Motion. She testified that she "wanted someone to understand [her] side of the story about why [she] was taking longer to do the [patient] documentation than other people." *Id*. at 110; Stmt. of Facts, ¶ 23. Moyer agreed that her call was concerning the "correctness or incorrectness of the discipline received on March 6th," a human resources issue. Moyer Dep. p. 133, Def.'s Motion. Moyer has no proof that either Brooks or Brown knew about her call to the compliance hotline at the time Brown made the decision to terminate her employment. Stmt. of Facts, ¶ 24. A couple of weeks after the incident with

Brooks, Moyer received a raise and an evaluation stating that she was meeting expectations. *Id*. at 81-82. Moyer's March 2007 performance evaluation was consistent with performance evaluations she had received in the past by white facility administrators. *Id*. at 83.

In mid-March of 2007, the Clinic experienced an outbreak of Methicillin-resistant Staphylococcus Aureus ("MRSA"), which is an antibiotic-resistant bacterial, commonly referred to as a "staph infection," easily transmitted from patient care provider to patient if the provider is not using PPE or washing hands after treatment of a patient or exposure to bodily fluids. Stmt. of Facts, ¶ 12. Plaintiff admits that she failed to follow DVA's infection control policy. *Id*. at ¶ 13. She also admits that, at times, she cried at work due to personal family issues. *Id*. On March 27, 2007, the Clinic had an infection control meeting. Moyer Dep. p. 136, Def.'s Motion. Immediately following that meeting, Brooks had to tell Moyer three separate times to put on her PPEs. *Id*.; Stmt. of Facts, ¶ 15. That same day, Brooks called a meeting that everyone was expected to attend. Moyer Dep. p. 102-03, Def.'s Motion; Stmt. of Facts, ¶ 18. Moyer testified that, at the time, she was on the phone with a patient's family member. Moyer Dep. p. 103-04, Def.'s Motion. Moyer admits that Brooks asked her to get off of the phone two or three times, and it took about five minutes for Moyer to get off the phone. *Id*. Moyer received a written warning, which did not result in loss of pay, suspension, or demotion. *Id*. at 108.

Also in March 2007, a patient came in with a temperature over one hundred degrees for dialysis treatment. *Id*. at 84. She states that she opened the needle to cannulate the

patient, leaving the needle exposed to the air, "walked two feet" from the patient, and then came back to the patient.  *Id*. at 88, 94.  Plaintiff testified that DVA policy and procedure dictates that she is to dispose of a needle if it has been exposed to the air because it can become contaminated.  *Id*. at 89.  Moyer does not recall whether the patient asked her to discard the needle.  *Id*. at 94.  Rather than comply with the policy and dispose of the needle that had been exposed to the air, Moyer used the needle on the patient.  *Id*. at 89.  That patient got an infection, and the patient's graft had to be replaced two days later, on March 28, 2007.  *Id*. at 90, 95.  Moyer, however, asserts that the graft may have already been infected because the patient was sick.  *Id*. at 95.  Moyer received an initial written warning, which did not result in loss of pay, suspension, or demotion.  *Id*. at 90, 108 and Dep. Exh. 7.

On April 5, 2007, Brown called a "homeroom meeting" regarding patient complaints about not receiving their dialysis treatments on time, and requested that all teammates keep patients on schedule for their appointments.  *Id*. at 111; Stmt. of Facts, ¶ 19.  During the meeting, Moyer raised her voice and let Brown know that she disagreed with what she was saying was the appropriate policy and procedure.  Moyer Dep. p. 111, Def.'s Motion.  When Brown began conversing with Moyer about time management, Moyer stated that she wanted to see it in writing.  *Id*. at 114.  At some point, Brown stated that she was not going to have an argument with Moyer at that time.  *Id*. at 113.  Moyer was terminated that day.  *Id*. at Exh. 9.  Moyer states that she assumed she was replaced by an African-American PCT she had previously worked with because that PCT came in the day she was terminated.  *Id*. at 142-43.

## II.  PROCEDURAL BACKGROUND

On December 20, 2007, Moyer filed her complaint in the Circuit Court of Pulaski County, Arkansas.  Therein, she alleges wrongful discharge in violation of the public policies of the State of Arkansas, retaliation, and race discrimination in violation of the Arkansas Civil Rights Act ("ACRA").  On January 30, 2008, DVA removed the case to this court.  On January 15, 2009, DVA filed its motion for summary judgment.

## III.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or

denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## IV.  DISCUSSION

A.    **ACRA Race Discrimination Claim**

Plaintiff brings a race discrimination claim pursuant to the Arkansas Civil Rights Act ("ACRA"), which provides in pertinent part:

(a) The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. This right shall include, but not be limited to:

(1) The right to obtain and hold employment without discrimination[.]

Ark. Code Ann. § 16-123-107(a)(1).  "A defendant may avoid liability under this subchapter by showing that his or her actions were based on legitimate, nondiscriminatory factors and not on unjustified reasons."  Ark. Code Ann. § 16-123-103(c).  The Arkansas Supreme Court looks to Title VII and federal cases interpreting Title VII for guidance on discrimination claims brought pursuant to the ACRA.  *Island v. Buena Vista Resort*, 352 Ark. 548, 557, 103 S.W.3d 671, 675-76 (2003).

In Title VII race discrimination cases, a plaintiff may survive a defendant's motion for summary judgment by presenting "direct evidence of discrimination, that is evidence showing a specific link between the alleged discriminatory animus and the challenged decision sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). Although Moyer asserts that there is direct evidence of discrimination in the record, the court disagrees and notes that Moyer provides no support for this assertion.

"Alternatively, if the plaintiff lacks direct evidence of discrimination, the plaintiff may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* "Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facia case of discrimination." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). "To meet her burden, a plaintiff must show the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently." *Id.* In reverse race discrimination cases, such as this one, the Eighth Circuit has "required that the prima facie case include a showing that background circumstances support the suspicion that the defendant is that unusual employer

8

who discriminates against the majority." *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004) (internal quotation marks omitted).  The establishment of a prima facie case creates a presumption of unlawful discrimination, which in turn requires a defendant to come forward with evidence of a legitimate, nondiscriminatory reason for the defendant's actions. *McGinnis*, 496 F.3d at 873.  "If the defendant articulates such a reason, the burden returns to the plaintiff to show the defendant's proffered reason is pretextual." *Id*.

DVA asserts that Moyer cannot establish a prima facie case of discrimination because she was not meeting the legitimate work expectations of DVA.  DVA also asserts that Moyer cannot identify any similarly situated employees who were treated better, and has presented no proof that DVA is the unusual employer who discriminates against the majority.

In her response, Moyer relies, in part, upon the deposition of Debra Cumberbatch. Cumberbatch is a registered nurse who was formerly employed at DVA.  Cumberbatch Dep. p. 9, Plaintiff's Response ("Pltf.'s Resp.").  Cumberbatch testified that she resigned because Brooks and Brown treated her unfairly, and that Brooks was prejudiced against Caucasians and foreigners.  *Id*. at 9, 15-16.  Cumberbatch also testified that she is of African descent, but is from Guyana, South America.  *Id*. at 16.  Additionally, Cumberbatch testified that Brooks was unprofessional, "talked down to her employees," yelled at Moyer to get off her clock, and discussed inappropriate personal issues at work.  *Id*. at 25, 36.

Moyer also provides the depositions of Elizabeth Payan and Margaret Eldred, both Caucasian employees of DVA.  Payan testified that Brown screamed at her, and Brooks's

9

treatment of her was harassment.  Payan Dep. p. 21, 34, Pltf.'s Resp.  She also testified that

if a white employee went against Brooks or Brown, there was retaliation, and that Brooks and

Brown tried to provoke Moyer.  *Id*. at 36-37, 39.  Payan testified that after she reported

Brooks, Brooks tried to provoke her.  *Id*. at 40.  Payan also testified, however, that "there was

retaliation even against a couple of the black girls too."  *Id*. at 37.  Eldred testified that

Brooks and Brown protected one another, and that Brown was aggressive and unprofessional.

Eldred Dep. p. 10, 12, Pltf.'s Resp.  She also testified that Brooks was not "quite honest"

about infection control and that Brooks tried to blame Moyer for the MRSA outbreak.  *Id*.

at 33, 35.  Eldred testified that Brooks tried to "push [her] buttons," and that Brooks called

her a racist at one point.  *Id*. at  38, 43.

Moyer identified two African-American PCTs, Connie Dodson and Angie Bass,

whom she believes are "similarly situated" to her.  Stmt. of Facts, ¶ 21.  Moyer testified in

her deposition that she reported to Brooks that, at times, neither Dodson nor Bass wore

PPEs.  Moyer Dep. p. 50-51, Def.'s Motion.  Moyer, however, testified that she heard either

Brown or Brooks tell either Dodson or Bass to get their PPEs on, and Dodson or Bass

complied with the request.  *Id*. at 51-52.  She also testified that Bass would sit with her feet

propped up reading the paper for forty-five minutes, leaving Moyer to cover her work; that

Bass took personal calls and talked on her cell phone regularly while at work; that Bass took

her children to school on the clock; and that she would frequently call in and not come to

work.  *Id*. at 47, 52-53.  Additionally, Moyer testified that Dodson was able to go to school

on the clock and not get disciplined for it.  *Id*. at 50.  Moyer stated that several other staff members complained about Bass's behavior.  *Id*. at 53.

The court finds that Moyer cannot establish her prima facie race discrimination case because she was not meeting the legitimate work expectations of DVA.  Admittedly, Moyer failed to abide by company policy with regard to infection control and professional conduct on a number of occasions.

Also, Moyer has failed to identify any similarly situated employees who were treated better, even assuming the allegations against Dodson and Bass are true.  "Employees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways."  *Harvey v. Anheuser-Busch, Inc*., 38 F.3d 968, 972 (8th Cir. 1994).  Here, Moyer offers no proof as to whether or not Bass and Dodson were ever disciplined regarding any of the alleged incidents.  In fact, Moyer testified that she did not know whether Brooks ever disciplined Bass and did not know whether Dodson was disciplined regarding time keeping.  Moyer Dep. p. 48, 54, Def.'s Motion.  Moyer admits that she is unaware whether Dodson or Bass, or any other teammate: (1) yelled and cried on the treatment floor; (2) used contaminated medical equipment; (3) acted inappropriately and unprofessionally with supervisors on multiple occasions; and (4) failed to wear PPE despite just being trained on DVA's policy and being reminded three times to do so.  Stmt. of Facts, ¶ 21.  Specifically, Moyer testified that she was not aware of any PCTs who have been in a meeting with Brooks or Brown who have stormed out of the office yelling, screaming, and

11

crying like she did.  Moyer Dep. p. 78, Def.'s Motion.  She also testified that she is not aware of any other PCT that "opened a needle to cannulate a patient, took the sterile tip off, and walked around with it exposed to air and then put it in the patient." *Id*. at 95. The conclusory opinion testimony of Cumberbatch, Payan, and Eldred does not adequately support Moyer's case.

Moyer has also failed to show any background circumstances supporting the suspicion that DVA is that unusual employer who discriminates against the majority.  The court notes that Moyer admits that Brooks, the alleged discriminator, hired and fired both white and black teammates.  Stmt. of Facts, ¶ 23.

Even assuming Moyer could establish a prima facie case of race discrimination, DVA has offered a legitimate, nondiscriminatory reason for Moyer's termination, and Moyer has failed to establish pretext.  The Eighth Circuit has consistently held that insubordination and violation of company policy are legitimate reasons for termination.  *See Johnson v. AT & T Corp.*, 422 F.3d 756, 762 (8th Cir. 2005); *Ward v. Procter & Gamble Paper Prods. Co.,* 111 F.3d 558, 560 (8th Cir. 1997); *Price v. S-B Power Tool,* 75 F.3d 362, 365-66 (8th Cir. 1996); *Miner v. Bi-State Dev. Agency,* 943 F.2d 912, 913-14 (8th Cir. 1991).  Therefore, summary judgment is appropriate as to Moyer's race discrimination claim under the ACRA.

**B.**     **Wrongful Discharge and Retaliation**

Moyer asserts wrongful discharge and retaliation in violation of the public policy of the State of Arkansas.  The Arkansas Supreme Court has held that an "at-will employee

cannot be terminated if he or she is fired in violation of a well-established public policy of the State, but such public policy must be outlined in our statutes." *Island*, 352 Ark. at 561-62. "[A]n at-will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the State." *Id*. The public policy of the State of Arkansas prohibits the termination of at-will employees based on race discrimination and retaliation. *Id*. at 563-64 (sexual harassment context); Ark. Code. Ann. §§ 16-123-107(a)(1) and 16-123-108.

A prima facie case of wrongful discharge or retaliation in violation of public policy is made by presenting substantial evidence that discrimination or retaliation was a cause of the discharge. *Gen. Elec. Co. v. Gilbert*, 76 Ark. App. 375, 381, 65 S.W.3d 892, 897 (2002). "The burden of establishing a prima facie case of wrongful discharge is upon the employee, but once the employee has met his burden, the burden shifts to the employer to prove that there was a legitimate, [nondiscriminatory or] nonretaliatory reason for the discharge." *City of Huntington v. Mikles*, 96 Ark. App. 213, 219, 240 S.W.3d 138, 143 (2006).

As discussed above, Moyer cannot establish that her termination was the result of race discrimination. Furthermore, she has failed to rebut DVA's legitimate nondiscriminatory reason for the discharge. Thus, her wrongful discharge claim fails.

As to Moyer's retaliation claim, it is unclear whether plaintiff asserts a claim of retaliation in violation of the public policy of the State of Arkansas or in violation of the ACRA. Regardless, Moyer's claim fails.

Arkansas Code Annotated § 16-123-108 provides:

(a) Retaliation. No person shall discriminate against any individual because such individual in good faith has opposed any act or practice made unlawful by this subchapter or because such individual in good faith made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(b) Interference, Coercion, or Intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this subchapter.

(c) Remedies and Procedures. The remedies and procedures available in § 16-123-107(b) shall be available to aggrieved persons for violations of subsections (a) and (b) of this section.

"To overcome summary judgment on a retaliation claim under ACRA, a plaintiff must make the same showing as is required on an analogous claim under Title VII." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 861 (8th Cir. 2005).

Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922 (8th Cir. 2007). "In order to establish a prima facie case of retaliation, the employee must produce evidence: (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Id.* (internal citations omitted). If Moyer establishes a prima facie case, the court must examine whether the DVA has offered a legitimate, nonretaliatory reason for its actions

14

and whether Moyer has presented any evidence that the explanation given is pretextual. *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004).

First, it is not clear that Moyer engaged in protected activity by calling the compliance hotline.  Moyer admits that her call was regarding a human resources issue and the correctness or incorrectness of the verbal reprimand she received.  There is no indication by Moyer that she called to report any violation of law or discrimination.

Even assuming, however, that Moyer engaged in protected activity, she has failed to establish a causal connection exists between her call to the compliance hotline and her termination.  Moyer did not tell anyone she was calling the compliance hotline.  Moyer admits that she has no proof that either Brooks or Brown knew about her call to the compliance hotline at the time the decision to terminate her employment was made.  Also, Moyer received a raise a couple of weeks after the call, and her termination did not occur until a month later.

Finally, DVA has offered a legitimate, nonretaliatory reason for Moyer's termination, and Moyer has failed to establish pretext.  Once again, insubordination and violation of company policy are clearly legitimate reasons for termination.  Therefore, Moyer's retaliation claim fails, and summary judgment is appropriate.

Accordingly, defendants' motion for summary judgment (Docket No. 13) is granted.  Judgment will be entered.

IT IS SO ORDERED this 20th day of February, 2009.


_____
UNITED STATES DISTRICT JUDGE